| | | |
|---|---|---|
| ROSA MARIA PENA MARTINEZ, | ) | Case No. CV 18-06155-AS |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION** |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW M. SAUL, Commissioner | ) | |
| of the Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PROCEEDINGS**

On July 16, 2018, Plaintiff filed a Complaint seeking review of the denial of her application for Disability Insurance Benefits. (Docket Entry No. 1). The parties have consented to proceed before the undersigned United States Magistrate Judge. (Docket Entry Nos. 11, 21). On December 27, 2018, Defendant filed an Answer along with the Administrative Record ("AR"). (Docket Entry Nos. 13-14). On June 14,

---

[1] Andrew M. Saul is now the Commissioner of the Social Security Administration and is substituted in for Acting Commissioner Nancy A. Berryhill in this case. <u>See</u> Fed.R.Civ.P. 25(d).

2019, the parties filed a Joint Stipulation ("Joint Stip.") setting forth their respective positions regarding Plaintiff's claims. (Docket Entry No. 25).

The Court has taken this matter under submission without oral argument. <u>See</u> C.D. Cal. L.R. 7-15.

## BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

On February 26, 2014, Plaintiff, formerly employed as an adult home care worker, childcare worker, mechanical assembler (antenna, watches, airplane parts), and agricultural field worker (<u>see</u> AR 62-65, 228-33, 239-44), filed an application for Disability Insurance Benefits, alleging an inability to work because of a disabling condition since November 18, 2012. (<u>See</u> AR 198-201).[2] The Commissioner denied Plaintiff's application initially and on reconsideration. (AR 91, 105).

On November 29, 2016, the Administrative Law Judge ("ALJ"), Kyle E. Andeer, heard testimony from Plaintiff (represented by counsel) and an impartial vocational expert ("VE"), Steve Hughes. (<u>See</u> AR 45-74). On January 5, 2017, the ALJ issued a decision denying Plaintiff's application. (<u>See</u> AR 29-36). Applying the five-step sequential process, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since November 18, 2012, the alleged onset date, through June 30, 2015, the date last insured. (AR 31). At step

---

[2] On the same date, Plaintiff filed an application for Supplemental Security Income, alleging a disability since November 18, 2012. (<u>See</u> AR 202-07). Plaintiff's application for SSI was denied for reasons related to Plaintiff's and her husband's financial resources. (<u>See</u> AR 108-15).

two, the ALJ determined that Plaintiff had the following severe impairments -- "obesity; degenerative disc disease, lumbar spine; affective disorder; diabetes mellitus; [and] status post shoulder repair. (AR 31). At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments. (AR 31-33).

The ALJ then determined that Plaintiff had the residual functional capacity ("RFC")[3] to perform light work,[4] as defined in 20 C.F.R. § 404.1567(b) with the following limitations:

> [Plaintiff] can push/pull frequently but not constantly; cannot climb ropes, ladders and scaffolds; can climb ramps or stairs occasionally; can balance frequently; can stoop, crouch, kneel and crawl occasionally; must avoid concentrated exposure to extreme heat, wetness and humidity; must avoid hazards including moving machinery and unprotected heights; can do simple routine, repetitive tasks; can interact with coworkers, supervisors and the public occasionally; and can be employed in a low stress job, with only occasional decision-making or judgment required and with only occasional changes in the work setting.

---

[3]    A Residual Functional Capacity is what a claimant can still do despite existing exertional and nonexertional limitations.    See 20 C.F.R. §§ 404.1545(a)(1).

[4]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

(AR 33-35). At step four, the ALJ determined that Plaintiff was capable of performing past relevant work as a small products assembler as actually and generally performed (AR 35) and therefore was not disabled within the meaning of the Social Security Act. (AR 35-36).

The Appeals Council denied Plaintiff's request for review on May 22, 2018. (See AR 1-5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. See 42 U.S.C. §§ 405(g), 1383(c).

## STANDARD OF REVIEW

This Court reviews the Commissioner's decision to determine if it is free of legal error and supported by substantial evidence. See Brewes v. Comm'r, 682 F.3d 1157, 1161 (9th Cir. 2012). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). To determine whether substantial evidence supports a finding, "a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion." Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001)(internal quotation omitted). As a result, "[i]f the evidence can support either affirming or reversing the ALJ's conclusion, [a court] may not substitute [its] judgment for that of the ALJ." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).[5]

---

[5] The harmless error rule applies to the review of administrative decisions regarding disability. See McLeod v. Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011); Burch v. Barnhart, 400 F.3d 676, (continued...)

4

**PLAINTIFF'S CONTENTIONS**

Plaintiff alleges that the ALJ erred in failing to properly: (1) assess Plaintiff's subjective symptom testimony and Plaintiff's daughter's testimony; (2) assess the opinions of Plaintiff's treating physicians; and (3) determine whether Plaintiff could perform past relevant work. (See Joint Stip. at 3-7, 11-22).

**DISCUSSION**

After consideration of the record as a whole, the Court finds that the Commissioner's findings are supported by substantial evidence and are free from legal error.

**A.   The ALJ Properly Assessed The Testimony and Statements Provided by Plaintiff and Plaintiff's Daughter**

Plaintiff asserts that the ALJ did not provide clear and convincing reasons for discrediting Plaintiff's testimony about her symptoms and limitations and asserts that the ALJ did not provide germane reasons for discrediting Plaintiff's daughter's testimony. (See Joint Stip. at 3-7, 11-12).   Defendant contends that the ALJ properly discounted the testimony of Plaintiff and her daughter.   (See Joint Stip. at 7-11).

//

---

⁵  (...continued)
679 (9th Cir. 2005)(An ALJ's decision will not be reversed for errors that are harmless).

5

1.   <u>Legal Standard</u>

A.   Plaintiff's Testimony

Where, as here, the ALJ finds that a claimant suffers from a medically determinable physical or mental impairment that could reasonably be expected to produce her alleged symptoms, the ALJ must evaluate "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities for an adult . . . ." Soc. Sec. Ruling ("SSR") 16-3p, 2017 WL 5180304, *3.[6]

A claimant initially must produce objective medical evidence establishing a medical impairment reasonably likely to be the cause of the subjective symptoms. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1281 (9th Cir. 1996); <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345 (9th Cir. 1991). Once a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his or her pain and symptoms only by articulating specific, clear and convincing reasons for doing so. <u>Brown-Hunter v. Colvin</u>, 798 F.3d 749, 755 (9th Cir. 2015)(citing <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1036 (9th Cir. 2007)); <u>see</u> <u>also</u> <u>Smolen</u>, <u>supra</u>; <u>Robbins v. Social Sec. Admin</u>, 466 F.3d

---

[6]    SSR 16-3p, which superseded SSR 96-7p, is applicable to this case, because SSR 16-3p, which became effective on March 28, 2016, was in effect at the time of the Appeal Council's May 22, 2018 denial of Plaintiff's request for review.  20 C.F.R. § 404.1529, the regulation on evaluating a claimant's symptoms, including pain, has not changed.

880, 883 (9th Cir. 2006); <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998); <u>Light v. Social Sec. Admin.</u>, 119 F.3d 789, 792 (9th Cir. 1997). Because the ALJ does not find that Plaintiff was malingering, the "clear and convincing" standard stated above applies.

Generalized, conclusory findings do not suffice. <u>See</u> <u>Moisa v. Barnhart</u>, 367 F.3d 882, 885 (9th Cir. 2004)(the ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected [the] claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony") (citation and internal quotation marks omitted); <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1208 (9th Cir. 2001)(the ALJ must "specifically identify the testimony [the ALJ] finds not to be credible and must explain what evidence undermines the testimony"); <u>Smolen</u>, 80 F.3d at 1284 ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion.").

B.  Plaintiff's Daughter's Testimony

The ALJ is required to give germane reasons for rejecting or partially rejecting lay witness testimony. <u>See</u> <u>Carmickle v. Comm'r v. Soc. Sec. Admin.</u>, 533 F.3d 1155, 1162-63 (9th Cir. 2008); <u>Greger v. Barnhart</u>, 464 F.3d 968, 972 (9th Cir. 2006); <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001); <u>Smolen</u>, 80 F.3d at 1288-89.

//

//

//

2. <u>The ALJ's Credibility Findings</u>

Plaintiff made the following statements in a Function Report – Adult dated April 10, 2014 (<u>see</u> AR 254-61):

She lives with family in a trailer. She suffers pain in her back, right arm, and right shoulder. (<u>See</u> AR 254-55).

As a result of her conditions, she cannot carry anything heavy, can barely move stuff around, and cannot sleep (back pain). She does not take care of anybody else or pets. She cannot bathe because she cannot reach with her right arm. She has trouble with caring for her hair (she cannot use her right hand, only her left hand). She cannot shave because she cannot move her right arm. She has trouble feeding herself and using the toilet because of pain in her right arm. She does not need reminders taking care of personal needs or taking medicine. She daily prepares meals (mostly on the stove or sometimes sandwiches) every 2 to 3 hours, which takes 15 to 30 minutes; her depression and anxiety cause her to eat a lot. She cleans the house, but not very much (20 minutes most); her family sometimes helps her. She does not drive; she gets rides from others when she goes out. She shops in stores 1 to 2 times a week. She is not able to pay bills, handle a savings account, or use a checkbook/money orders, but she is able to count change. Her ability to handle money has changed because of her inability to use her right hand. Her only interest is watching television. She does not spend time with others. She goes to church every Sunday, usually with somebody. She does not have any problems getting along with others. She does not feel like going out with others because of her pain. (<u>See</u> AR 255-59).

Her conditions affect her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, stair-climb, see, concentrate, use hands, and memory. She can walk for about 20 to 30 minutes before needing to rest, and can resume walking after resting for 15 minutes. She cannot concentrate; whether she finishes what she starts "depends." She struggles with following written instructions. She can follow spoken instructions but then forgets them. She gets along well with authority figures, but does not have contact with them. She has never been fired or laid off from a job because of problems getting along with other people. She handles stress by lying down in her room, and handles changes in routine "so so." Her unusual behaviors or fears are fear/anxiety of being alone and sometimes seeing things that are not there. (<u>See</u> AR 259-61).

8

Plaintiff made the following statements in a Function Report - Adult dated September 2, 2016 (see AR 301-10):

> She lives with family in a mobile home. She suffers pain in her back, right arm, right shoulder, hip and right leg. She is not able to work because of her pain; she cannot use her right arm, bend, pick up anything, sit (more than 10 minutes), walk (more than 7 minutes), clean her house (without the help of her daughters or a friend). (See AR 301, 306).

> She needs help getting out of bed, making her bed, getting up from the toilet, showering, shaving, grooming, cleaning, cooking, and going to bed. She does not take care of anybody else or pets. As a result of her conditions, she can no longer cook, clean, shower, work, go to the gym, dance or take care of her grandchildren, or sleep (she has to change positions all night). She is not able to dress herself, bathe (without assistance), care for her hair (she can only use her left hand), shave (without assistance), feed herself (she can only use her left hand), use the toilet (without assistance getting up). She needs reminders from her daughters to shower and to take medicine. She does not prepare her own meals because she cannot stand for very long or use her right hand; her family does all the cooking. She does not do any house or yard work because of her extreme pain; her family does them for her. She goes out riding in a car or walking (she can only walk for seven minutes, and her daughters are afraid she will fall or hurt herself). She does not shop; her daughters do all the shopping. She is not able to pay bills, handle a savings account or use a checkbook/money orders (she never had a checkbook or savings account), but she is able to count change. Her ability to handle money has changed because she forgets and asks the same question. Her interests are reading the Bible (she can not read as long as before) and going for walks (she can no longer speed walk). She spends time with others daily because she needs assistance with everything. She goes to church on Sundays. She needs to be reminded to go to the doctor and needs to be accompanied. She does not have any problems getting along with others. During all conversations she complains about pain. (See AR 302-06).

> Her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair-climb, see, memory, complete tasks, concentrate, understand, follow instructions, and use her hands. She can pay attention for a few minutes before she starts feeling pain. She does not follow written instructions well. She does not follow spoken instructions well (the instructions need to be repeated a few times). She gets along well with authority figures. She has never been fired or laid off because of problems getting along with other people. She does not handle stress well (she gets frustrated and aggressive), and does not handle changes in

routine well (she tends to forget). Her unusual behavior or fear is feeling very afraid. She daily uses a cane (prescribed in 2013) and glasses/contact lenses. (<u>See</u> AR 306-07).

For her conditions, she currently takes the following medicines (none of which cause side effects): Duloxetine, 30 mg; Gabapentin, 300 mg; Methacarbanol, 750 mg (4 times/day); Topiramate, 2 mg (2 times/day); Cyclosbenzaprine, 10 mg (3 times/day); Aspirin, 81 mg (1 time/day); Fluoxetine, 20 mg (1 time/day), Glipizide, 10 mg (1 time/day); Lisinopril, 12.5 mg (1 time/day); Metformin, 1000 mg (2 times/day); Naproxin, 500 mg (2 times/day); Simuastatin, 40 mg (1 time/day), Tramadol, 50 mg (2 times/day); Victoza, 20 mg (1 time/day); Lantus, 20 mg (1 time/day); Norco, 10.325 mg (1 time/day); Invocana, 300 mg (1 time/day); Januvia, 300 mg (1 time/day); Metformin, 1000 mg (2 times/day); and Bupropion, 150 mg (1 time/day). (<u>See</u> AR 308-10).

Plaintiff gave the following testimony at the administrative hearing (<u>see</u> AR 46-63):

In November 2012, when she was taking care of an elderly person, she was cleaning the bathroom and fell, injuring her back and her entire right side (arm, shoulder). She has not worked since then. She filed a Workers' Compensation case which settled in February 2014. She did not get continuing medical care from the accident. She continues to suffer pain mostly in the lower back, and still has pain in her arm, shoulder, hand (numbness and pain) leg, knee and foot (heel, bottom of foot, and toes). Since the accident she has fallen several times which has caused her pain to get worse. The pain in her foot interferes with her activity; she feels pain in her foot even when she is just sitting (but it is not as painful). She is unable to do her past assembler jobs (antennas, watches) because she cannot sit or stand for a long time. (<u>See</u> AR 46-52, 62-63).

Her doctor has told her that they want to give her injections for her knee. However, her diabetes doctor told her that injections sometimes make the sugar level go higher. (<u>See</u> AR 49).

She last had physical therapy for her right shoulder in 2012 or 2013. That physical therapy caused her pain sometimes. (<u>See</u> AR 48).

She takes Norco (pain medication) two times a day, although her doctor prescribed it only one time a day. She also takes Naproxin, but that does not help much with the pain ("it helps control the pain level a little bit"). <u>See</u> AR 52-53).

10

Her diabetes causes problems with her eyes. She checks her blood sugar twice a day. Her blood sugar level is over 200. She began to see a new diabetes doctor (Dr. Pinzone) a month ago. Dr. Pinzone stopped a lot of her medications and gave her a different medication. (See AR 49-50, 58-59).

She weighs 270 pounds (she once weighed 300 pounds). Her weight causes the pain in her lower back to be worse. She stopped taking medication which had caused her to gain weight. (See AR 60).

In May 2016, she went to the hospital because of breathing problems. The electrocardiograms did not reveal any issues. Since then she has had heart palpitations. (See AR 61-62).

Following the accident she suffered bad depression. She sometimes suffers bad depression and anxiety, which causes her to eat (which is bad for her diabetes). She sometimes does not feel like waking up, showering or leaving the room. She gets depressed/suicidal when she thinks about not being able to work and help others (such as her brother who underwent heart surgeries). At one point (after she had told her doctor she wanted to die), her doctor called police who took her to a hospital for a mental evaluation. (See AR 50, 55-59).

She has seen a psychiatrist (Dr. Wilkinson) and a psychologist (Dr. Alvarado). She regularly takes the medications prescribed by Dr. Wilkinson, but they do not work some days. She stopped taking the medications 15 days ago because they made her feel worse. She does not think Dr. Alvarado is helping her. Although she does not feel the doctors have helped her with her depression, she was told that her diabetes has contributed to her depression. (See AR 56-58).

She lives with her in-laws in a trailer. Her day consists of getting up, getting coffee from the stove (the coffee pot is already there), preparing food (like a sandwich), sitting for a little while to eat, standing, taking a shower (with her daughter's assistance), and sometimes cleaning the trailer (with her daughter's assistance). She showers every two days. (See AR 54-55, 59).

She is able to walk for about 10 minutes. She began using a cane about two months ago (when she fell). Getting up using the cane causes swelling and numbness in the hand and pain in the arm. She can stand for about 5 minutes (to wash dishes). She can sit for 10 to 12 minutes, but needs to move around and change positions. She can lift about 10 pounds. Since she does not drive, she has to ask others for rides to get to her doctors' appointments. (See AR 50, 53-54, 61-63).

In a Function Report - Adult - Third Party dated November 9, 2016, Plaintiff's daughter, who is 28 years-old and spends 4 days a week with Plaintiff, made essentially the same statements as those made by Plaintiff in her Function Report - Adult dated September 2, 2016 (with the exception of Plaintiff's medications). (See AR 311-18).

After briefly summarizing Plaintiff's testimony (see AR 33)[7], the ALJ wrote: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR 20).

The ALJ addressed Plaintiff's testimony as follows:

The claimant suffered a work injury on November 18, 2012, the alleged onset date. She stated that she slipped and fell and landed on her glutes and right upper extremity (Exhibit 1F at 1).

She was treated through the Workers' Compensation system. Treatment included acupuncture, opioid medications, chiropractic care, and physical therapy (Exhibits 1F; 2F). She was given temporary work restrictions of lifting, pushing, and pulling only 10 pounds and limit (sic) sitting,

---

[7]    The ALJ wrote:

The claimant testified that she has problems with her right arm and back. She stated that she continues to have pain in her lower back with any motion. The claimant reported should (sic) emergency department pain, but stated that she has not had any treatment for her shoulder recently. The claimant reported depression and anxiety.

standing, and walking to 15 minutes or 30 minutes followed by
a 5-minute break or change in position (Exhibit 2F at 2, 29,
48, 124, 128, 149). The claimant stopped seeing Dr.
Moelleken in January 2014 (Exhibit 9F at 1; 13F at 1). It
does not appear that she ever received injections, nor was
surgery recommended. She stated that she settled her
Workers' Compensation case in February 2014 with no ongoing
medical coverage.

She returned to Dr. Moelleken, however, over two years later
in March 2016 asking for pain medications (Exhibit 9F at 1).
In that interim, the claimant generally reported no pain
symptoms or back or joint problems to her primary care
provider (Exhibit 11F). The claimant saw Dr. Moelleken in
August 2016, but reported that she had not taken pain
medications for over two weeks, suggesting that her pain was
not particularly severe (Exhibit 12F at 1). The claimant
then followed up more regularly with Dr. Moelleken receiving
Norco (Exhibit 16F).

This history suggests that while the claimant may have
sustained an injury at the alleged onset date, she was
managed with only conservative care and eventually settled
the claim with no provision for ongoing medical care. This
suggests that the claimant's symptoms resolved
satisfactorily. The claimant had reported that her
medications were effective and allowed her to do more
activities around the house and self-care (Exhibit 2F at 5).

The claimant's physical examinations were generally normal
(Exhibits 14F; 18F) and the imaging and diagnostic studies in
the record do not show the types of severe findings that
would be expected were the claimant's symptoms as severe as
alleged. MRI of the lumbar spine showed degenerative disc
disease and mild canal stenosis and mild foraminal farrowing
(Exhibit 3F at 115-116). MRI of the right hip showed only
minimal spurring (Exhibit 3F at 121). MRI of the right knee
did not show definite tear (Exhibit 3F at 125). MRI of the
right shoulder showed mild to moderate supraspinatus and
infraspinatus tendinosis (Exhibit 3F at 127). X-ray of right
shoulder was normal (Exhibit 1F at 1).

Follow up for the claimant's diabetes mellitus did not show
severe symptoms that would limit her ability to perform work
activity greater than found herein (Exhibit 4F; 11F). There
is also mention that the claimant's compliance may not have
been full (Exhibit 11F at 9, 23, 31; 14F at 9, 61; 18F at 3).

As for the claimant's mental symptoms, suicidal ideation was
reported once (Exhibit 2F at 21). She was then prescribed
medications and her symptoms improved (Exhibit 2F at 5).
Reports from some treatment providers do not suggest that she
would have limitations greater than those assigned herein
(Exhibit 17F at 1; 19F).

The record reflects daily activities of the claimant that are
not limited to the extent one would expect, given the

13

> complaints of disabling symptoms and limitations. The claimant reported she is able to handle finances and go out alone (Exhibit 6F at 3).

(AR 33-34).

After discussing the opinions of the orthopedic consultative examiner, the psychological consultative examiner, and Plaintiff's treating psychologist, as well as the weight given to such opinions (see AR 35), the ALJ addressed Plaintiff's daughter's testimony as follows: "The undersigned considered the statement of the claimant's daughter at Exhibit 16E and notes that this statement details the same types of complaints and symptoms already alleged by the claimant. Thus, the undersigned finds that this evidence is cumulative with respect to the allegations by the claimant and, as explained above, the objective evidence provides good reasons for questioning the reliability of the claimant's subjective complaints. Accordingly, the undersigned gives this statement little weight." (AR 35).

3. The ALJ's Assessments of Testimony Provided by Plaintiff and Plaintiff's Daughter

A. Plaintiff's Testimony

Substantial evidence supports the ALJ's finding that Plaintiff's testimony about the intensity, persistence and limiting effects of the symptoms related to her injuries suffered during her November 2012 accident was not credible.[8]

_____

[8] Since Plaintiff appears to challenge the ALJ's reasons for discounting Plaintiff's testimony concerning the limitations resulting from her 2012 accident, the Court need not address the ALJ's reasons for

(continued...)

14

The ALJ properly discounted Plaintiff's testimony concerning the limiting effects of the physical injuries she suffered during her November 2012 accident based on her positive response to conservative treatment (see AR 34). See Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008)("The record reflects that Tommasetti responded favorably to conservative treatment including . . . the use of anti-inflammatory medication [and] a transcutaneous electrical nerve stimulation unit . . . . Such a response to conservative treatment undermines Tommasetti's reports regarding the disabling nature of his pain."); Crane v. Shalala, 76 F.3d 251, 254 (9th Cir. 1996)("the evidence suggesting that [the claimant] responded well to treatment" supports an adverse credibility finding); see also Warre v. Comm'r of the SSA, 439 F.3d 1001, 1006 (9th Cir. 2006)("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."). As the ALJ noted, Plaintiff received a variety of treatments following the accident, including acupuncture, opioid medications, chiropractic care, and physical therapy (see AR 321-34 [Performance Therapy Center records from January 4, 2013 to January 22, 2013], AR 335-484 [The Spine and Orthopedic Center records from February 12, 2013 to January 14, 2014, several of which noted that Plaintiff had been prescribed Norco (see AR 483, 473, 465-66, 454, 438, 427, 412, 386, 340 [Progress Notes dated February 12, 27, 2013, March 18, 2013, April 16, 2013, June 3, 2013, July 2, 2013, August 6, 2013, October 31, 2013, December 5, 2013, and

---

8   (...continued)
discounting Plaintiff's testimony concerning her limitations related to her other impairments (i.e., diabetes, affective disorder).

January 13, 2014]), but those records, as well as other records from The Spine and Orthopedic Center (see AR 485-627), do not contain any notations that Plaintiff received injections or was recommended surgery.

In addition, as Defendant points out (see Joint Stip. at 9), several medical records expressly state that Plaintiff received only conservative treatment (see AR 81 [Timothy Schumacher, Ph.D., a State Agency medical consultant, when discussing the history following the accident, stated: "[W]orkmens comp IHSS comes in from York[,] they were treating her for lumbar spine awaiting block 112013[,] PT and other conservative tx/pain meds did not help much[.]"], 382 [In a Progress Note dated November 11, 2013, Alan P. Moelleken, M.D., Plaintiff's treating physician at The Spine and Orthopedic Center, when discussing Plaintiff's records, stated: "Denial of the medial branch block received on 9/03/2013. It appears that the reason for the denial of the right medial branch block at L4-5 and L5-S1 facet joints was that she had verterbral pain noted and it was not expressly stated that she has failed conservative treatment. . . . She has also tried conservative management with medications, a home exercise program, physical therapy, chiropractic therapy, and acupuncture, all which she failed."], 478 [In an Orthopedic 1 M. Price, M.D. at the Spine and Orthopedic Center, stated that "[f]uture medical considerations includes a hip arthroscopy specialist pending her response to more conservative treatment."]). Compare Boitnott v. Colvin, 2016 WL 362348, *4 (S.D. Cal. Jan. 29, 2016)(finding that the ALJ improperly discredited the plaintiff's testimony based on the conservative and routine nature of the plaintiff's treatment because inter alia "[t]here was no medical

16

testimony at the hearing or documentation in the medical record that the prescribed medication constituted 'conservative' treatment of [the plaintiff's] conditions"). Moreover, as the ALJ noted, Plaintiff herself admitted the effectiveness of the medications in alleviating her symptoms and limitations. (See AR 385 [Progress Note dated October 1, 2013, noting: "She reports some constipation with the medications and states that the Norco and cream decrease her pain by about 50 percent temporarily and increases her function."], 366 [Progress Report dated November 18, 2013, noting: "In regards to the medications, she has been using Norco 7.5/325 mg up to three times a day for pain as well as Ducoprene for opioid-induced constipation. . . . She notes that with the Norco and Ducuprene that these have been effective and allowing her to do more activities around the house and provide self-care."], 339 [Progress Report dated January 13, 2014 (same)].

The ALJ also properly discredited Plaintiff's testimony about the limiting effects of the physical injuries she suffered during the November 2012 accident because Plaintiff's assertions were not supported by the objective medical evidence (see AR 34). See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005)("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."); SSR 16-3p, *5 ("objective medical

evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities"). As the ALJ pointed out, the medical records revealed that Plaintiff's physical examinations were mostly unremarkable. (See AR 321 [Physical Therapy Initial Examination report dated January 4, 2013, noting that "Xray right shoulder normal"], 599-600 [MRI of the lumbar spine on May 1, 2013], 603 [MRI of the thoracic spine dated April 30, 2013], 605-06 [MRI of the left hip dated April 2, 2013], 607-08 [MRI of the right hip dated April 2, 2013], 609-10 [MRI of the right knee], 611-12 [MRI of the right shoulder], 613 [X-ray of the orbits dated February 28, 2013], 351-53, 355-57, 370-72, 374-76, 389-91, 399-401, 407-09, 415-17, 419-21, 437-39, 441-43, 449-51, 465-67, 469-71, 477-79, [The Spine and Orthopedic Center, Progress Reports dated February 12, 2013, March 13, 2013, March 18, 2013, April 16, 2013, May 29, 2013, June 3, 2013, July 9, 2013, July 10, 2013, August 7, 2013, August 29, 2013, September 4, 2013, October 30, 2013, November 5, 2013, December 11, 2013, January 7, 2014, containing normal physical examination or orthopedic examination findings], 833-35, 844-47, 859-61, 869-71, 886-88, 936-38, 941-43, 995-98, 1001-03 [Clinicas Del Camino Real, Inc. Office Visit notes and Physician's Assistant notes dated July 16, 2014, October 25, 2014, January 7, 2015, May 18, 2015, August 3, 2015, June 13, 2016, July 11, 2016, July 18, 2016, and August 8, 2016, containing normal physical examination findings]).

The ALJ also discounted Plaintiff's testimony about the limiting

effects of the physical injuries suffered during the November 2012 accident based on her ability to perform certain daily activities, such as handling finances and going out alone, was not a clear and convincing reason. (AR 34). However, this was not a clear and convincing reason for discrediting Plaintiff's symptom testimony. See Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001)("[T]he mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled."); Reddick, supra ("Only if the level of activity were inconsistent with the Claimant's claimed limitations would these activities have any bearing on Claimant's credibility."); Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014)("However, there is no indication here that the limited activities Ghanim engaged in, often with the help of a friend, either comprised a 'substantial portion' of Ghanim's day, or were 'transferrable' to a work environment."); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999). However, because the ALJ also provided valid reasons for discounting Plaintiff's testimony, as discussed above, any error in discounting Plaintiff's testimony based on her activities of daily living is harmless. See Carmickle, supra, 533 F.3d at 1162 (the ALJ's error in giving two invalid reasons for partially discrediting the plaintiff's testimony was harmless where the ALJ gave valid reasons for partially discrediting the plaintiff's testimony); see also Tommasetti, 533 F.3d at 1038 (an ALJ's error is harmless "when it is clear from the record . . . that it was 'inconsequential to the ultimate nondisability determination.'").

B.   Plaintiff's Daughter's Testimony

The ALJ's determination that Plaintiff's daughter's testimony was not supported by the objective evidence was a germane reason for finding that the testimony lacked credibility.  See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2015)(inconsistency with the medical evidence is a germane reason for discrediting the testimony of a lay witness); Lewis, supra ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence."); Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984)("The ALJ properly discounted lay witness testimony that conflicted with the available medical evidence.").

**B.   The ALJ Properly Assessed the Opinions of Plaintiff's Treating Physicians, Sandra Alvarado, Ph.D. and Alan P. Moelleken, M.D.**

Plaintiff asserts that the ALJ failed to properly assess the opinions of two of Plaintiff's treating physicians, Drs. Alvarado and Moelleken. (See Joint Stip. at 13-18).  Defendant asserts that the ALJ properly considered the opinions of Drs. Alvarado and Moelleken  (See Joint Stip. at 16-17).

An ALJ must take into account all medical opinions of record. 20 C.F.R. § 404.1527(b).  "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); see also Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  The medical

opinion of a treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2). "When a treating doctor's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency of the record." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017); see also 20 C.F.R. § 404.1527(c)(2)-(6).

If a treating or examining doctor's opinion is not contradicted by another doctor, the ALJ can reject the opinion only for "clear and convincing reasons." Carmickle, supra, 533 F.3d at 1164; Lester, 81 F.3d at 830. If the treating or examining doctor's opinion is contradicted by another doctor, the ALJ must provide "specific and legitimate reasons" for rejecting the opinion. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007); Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998); Lester, supra. "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Trevizo v. Berryhill, 871 F.3d 664, 675 (9th Cir. 2017)(citation omitted). Finally, when weighing conflicting medical opinions, an ALJ may reject an opinion that is conclusory, brief, and unsupported by clinical findings. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2015); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

21

1.   Dr. Alvarado

In a Mental Impairment Questionnaire dated November 8, 2016, Sandra Alvarado, Ph.D., a psychologist at Clinicas Del Camino Real, Inc., stated she had treated Plaintiff "[s]ince September 27th 2016 on a biweekly basis." (AR 1016).  Dr. Alvarado diagnosed Plaintiff inter alia with major depressive disorder, recurrent, severe; and stated that Plaintiff's signs and symptoms were anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, thoughts of suicide, blunt, flat or inappropriate affect, feelings of guilt or worthlessness, difficulty thinking or concentrating, psychomotor agitation or retardation, apprehensive expectation, memory impairment in the short, intermediate or long term, and sleep disturbance.  (AR 1016-17).[9]  Dr. Alvarado found, inter alia, that Plaintiff's impairments or treatment would cause Plaintiff to be absent from work for an average of more than four days per month and Plaintiff would have difficulty working at a regular job on a sustained basis because of "[l]imited movement due to chronic pain and not feeling well due to diabetes" which "make [Plaintiff's] depression worse[.]" (AR 1018).

The ALJ addressed Dr. Alvarado's opinions as follows:

The undersigned gives little weight to the opinions of the

_____

[9]   Dr. Alvarado stated that the clinical findings demonstrating the severity of Plaintiff's mental impairment and symptoms were "impaired memory (not remembering details at appointments) and depressed affect." (AR 1021).

claimant's treating psychologist at Exhibits 20F and 21F as the extreme limitations therein are inconsistent with the record showing no mental health treatment notes that showed severe symptoms unmanageable with normal treatment. Furthermore, this provider only recently started seeing the claimant, and thus, does not have a longitudinal relationship with the claimant.

(AR 35).

Since the ALJ did not find that Dr. Alvarado's opinions were contradicted by another physician's opinion, the ALJ was required to provide "clear and convincing" reasons for rejecting Dr. Alvarado's opinions. See Trevizo, supra.

The ALJ properly rejected Dr. Alvarado's opinions because her opinions, particularly her opinion concerning the average number of work days per month Plaintiff would miss, was inconsistent with the medical record which reflected that Plaintiff's mental health issues were caused or precipitated by the pain she suffered from her injury. (see AR 355 [The Spine and Orthopedic Center, Progress Report dated December 11, 2013, noting: "She also expresses depression and admits suicidal ideation. She states that the pain from her industrial injury has led to her depression, insomnia, decreased energy, appetite fluctuations, decreased concentration."], AR 339 [The Spine and Orthopedic Center, Progress Report dated January 13, 2014, noting: "She continues with Dr. Malkani for urinary incontinence issues. On 12/11/13, Dr. Malkani sent

the patient to the ER for suicidal ideations. He has started her on Venlafaxine 37.5mg qd. She reports this medication is working well for her and she denies any suicidal ideations at this time."], AR 929 [Letter from Kristin Wilkerson, PMHNP, at Clinicas Del Camino Real, Inc. dated November 4, 2016, stating that she first provided mental health treatment for Plaintiff on September 16, 2016, Plaintiff obtained follow-up treatment on October 14, 2016 (at which medication was prescribed), and Plaintiff was scheduled for follow-up treatment on November 9, 2016]). See Morgan v. Comm'r of Soc. Sec., 169 F.3d 595, 603 (9th Cir. 1999)("The ALJ is responsible for resolving conflicts in medical testimony, and resolving ambiguity."); see also 20 C.F.R. § 404.1527(d)(3)("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."); 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). This was a clear and convincing reason for discounting Dr. Alvarado's opinions.

    The ALJ also properly rejected Dr. Alvarado's opinions based on the short length of time, and the limited number of times, Dr. Alvarado treated Plaintiff (from September 27, 2016 to November 8, 2016, at most four times, see AR 1016). See 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will

give to the source's medical opinion."); compare <u>Rose v. Berryhill</u>, 256 F.Supp.3d 1079, 1089-90 (C.D. Cal. 2017)(finding that the treating physician's treatment of the plaintiff 7 times during an 8-month period was long enough for the treating physician to obtain a longitudinal picture of the plaintiff's impairment).

   2.   Dr. Moelleken

   Allan P. Moelleken, M.D., treated Plaintiff in connection with her Workers' Compensation claim from February 12, 2013 to January 14, 2014. (<u>See</u> AR 335-484).   More than two years later, on March 25, 2016, Dr. Moelleken treated Plaintif during a follow-up visit, prescribing medications and referring Plaintiff to a pain management consultation. (<u>See</u> AR 694-96, 826-32).

   Plaintiff submitted a one-page form from Dr. Moelleken, dated July 1, 2016, to the Appeals Council.  (<u>See</u> AR 42).[10]  The Appeals Council addressed the submitted form, stating: "The Administrative Law Judge decided your case through June 30, 2015.  This additional evidence does not relate to the period at issue.  Therefore, it does not affect the decision about whether you were disabled beginning on or before June 30, 2015."  (AR 2).

---

[10]    Dr. Moelleken opined that Plaintiff is likely to be "off task" 25 percent or more of the time, Plaintiff is capable of low stress work (because "pain level affect[s] stress"), Plaintiff's impairments are likely to produce "good days" and "bad days", Plaintiff is likely to be absent from work about four days per month as a result of the impairments or treatment, and Plaintiff's impairments are reasonably consistent with her symptoms and functional limitations.

As Respondent asserts (see Joint Stip. at 16), Plaintiff has waived this issue because although she was represented by counsel she did not allege to the Appeals Council that the ALJ failed to provide a reason for rejecting Dr. Moelleken's opinions (see AR 319-20). See Shaibi v. Berryhill, 883 F.3d 1102, 1109 (9th Cir. 2017)(plaintiff, when represented by counsel, waived a challenge on appeal when plaintiff failed to raise the issue during administrative proceedings before the Social Security Administration); see also Meanel v. Apfel, 172 F.3d 1111 (9th Cir. 1999)("We now hold that, at least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal.").

Nevertheless, since the Appeals Council appears to have looked at Dr. Moelleken's form while not explicitly considering it, the form is a part of the Administrative Record and must be considered by the Court in reviewing the ALJ's decision. See Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1163 (9th Cir. 2012)("[W]hen the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence.").

Dr. Moelleken's opinion form, completed on July 1, 2016, does not relate to the ALJ's determination of Plaintiff's nondisability for the the period at issue (November 18, 2012 to June 30, 2015) since there is no indication that Dr. Moelleken's opinion covers a period prior to 2016. Moreover, the checkbox form does not provide any clinical findings

supporting Dr. Moelleken's opinions.  See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002)("The ALJ need not accept the opinion of any physician including the treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.").

**C.    The ALJ Properly Determined That Plaintiff Could Perform Past Relevant Work as a Small Products Assembler**

Plaintiff asserts that the ALJ failed to properly determine that Plaintiff could perform her past relevant work as a small products assembler because (1) it was not clear from Plaintiff's testimony (particularly her testimony about her airplane parts assembler job) that she worked as a small products assembler, and (2) the ALJ did not ask the VE whether there was any conflict between the RFC (specifically, pushing/pulling frequently but not constantly, occasional interaction with coworkers, supervisors and the public, and employed in a low stress job) and the Dictionary of Occupational Titles ("DOT") description of the small products assembler occupation.  (See Joint Stip. at 18-22). Defendant asserts that the ALJ properly found that Plaintiff could perform her past relevant work as  a small products assembler as generally and actually performed, and that any error by the ALJ in asking the VE about a conflict between the RFC and the DOT was harmless. (See Joint Stip. at 20-21).

As noted above, Plaintiff testified that she is unable to do her past assembler jobs (antennas, watches) because she cannot sit or stand for a long time.  (AR 62-63).  When the VE attempted to clarify Plaintiff's past assembler jobs, Plaintiff stated that she had a third

27

past assembler job (airplane parts). (AR 64-65; <u>see also</u> AR 232, 242). Plaintiff also testified that at her past assembler jobs she could choose to either sit on a stool or stand. (AR 65).

The VE testified that even though Plaintiff did different things at her past assembler jobs, the duties she performed corresponded to the job of small products assembler (DOT 706.684-022, light work, Specific Vocational Preparation 2)[11], noting that Plaintiff's past assembler jobs allowed a sit/stand option and did not require lifting over 10 pounds, and that all of Plaintiff's past assembler jobs seemed to have the same exertional requirements. (<u>See</u> AR 66-67). Plaintiff testified that she

---

[11] DOT 706.684-022 Assembler, Small Products I, states, in pertinent part:

Performs any combination of following repetitive tasks on assembly line to mass produce small products, such as ball bearings, automobile door locking units, speedometers, condensers, distributors, ignition coils, drafting table subassemblies, or carburetors: Positions parts in specified relationship to each other, using hands, tweezers, or tongs. Bolts, screws, clips, cements or otherwise fastens parts together by hand or using handtools or portable powered tools. Frequently works at bench as member of assembly group assembling one or two specific parts and passing unit to another worker. Loads and unloads previously setup machines, such as arbor presses, drill presses, taps, spot-welding machines, riveting machines, milling machines, or broaches, to perform fastening, force fitting, or light metal cutting operation on assembly line. May be assigned to different work stations as production needs require or shift from one station to another to reduce fatigue factor. May be known according to product assembled.

STRENGTH: Light work - Exerting up to 20 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work.

28

performed the assembler job putting together watches beginning in 2001 and thereafter performed the assembler job putting together antennas. (AR 67).

The VE testified that a hypothetical person -- approaching advanced age, limited education, with Plaintiff's RFC -- could do Plaintiff's past assembler jobs. (See AR 68-70).

The ALJ found, based on the VE's testimony about Plaintiff's past relevant work (small products assembler [DOT 706.684-022, light exertional level, SVP 2) and Plaintiff's ability to perform her past relevant work given Plaintiff's RFC, that Plaintiff was able to perform her past relevant work as actually and generally performed. (See AR 35).

Plaintiff contends that the ALJ erred in finding that Plaintiff could perform past relevant work as a small products assembler because her past assembler job for airline parts, under DOT 806.381-022 [Assembler, Aircraft Power Plant], 806.381-026 [Assembler, Aircraft, Structures and Surfaces], and 806.361-014 [Assembler-Installer, Generally], requires a medium exertional level. (See Joint Stip. at 18-19). The Court disagrees.

The ALJ did not err in finding that Plaintiff could perform past relevant work as a small products assembler as actually and generally performed because the testimony and statements provided by Plaintiff

29

about her past assembler jobs was consistent with the small products assembler job identified in DOT 706.684-022.  See AR 233 ["I would perform the mechanical assembly of antenna parts.  I would have to place the parts in a machine that would show whether it worked or not."; When asked about lifting and carrying, Plaintiff stated, "They were small parts that would be reviewed to make sure they operated the way that they were supposed to."; and Plaintiff stated that the heaviest weight she lifted was less than 10 pounds and that she frequently lifted less than 10 pounds.], AR 65 [Plaintiff testified at the hearing that at her past assembly jobs she could sit on or a stool or stand up, whatever she chose], AR 232 ["I worked for an airplane part manufacturing, we would assemble the airplane parts."; "Most of the parts were not large and did not weigh that much."; The heaviest weight Plaintiff lifted was 10 pounds, and Plaintiff frequently lifted less than 10 pounds], AR 242 ["[P]arts for airplanes, assembling parts together"; "We didn't carry anything[,] parts were small; The heaviest weight Plaintiff lifted was less than 10 pounds, and Plaintiff frequently lifted less than 10 pounds]).

Plaintiff also contends that the ALJ erred in failing to ask the VE whether there was any conflict between the RFC (specifically, pushing/pulling frequently but not constantly, occasional interaction with coworkers, supervisors and the public, and employed in a low stress job) and the DOT 706.684-022 description of the small products assembler

30

occupation.   (<u>See</u> Joint Stip. at 19-22).[12]

An ALJ may not rely on a vocational expert's testimony regarding the requirements of a particular job without first inquiring whether the testimony conflicts with the DOT, and if so, why it conflicts.  <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1152-53 (9th Cir. 2007)(citing Social Security Ruling 00-4p).

However, since the DOT for the job of small products assembler does not address the pushing/pulling, interaction, and stress level limitations, as Plaintiff acknowledges (<u>see</u> Joint Stip. at 19), there was no conflict between the VE's testimony and the DOT.  <u>See</u> <u>e.g.</u>, <u>Dewey v. Colvin</u>, 650 Fed.Appx. 512, 514 (9th Cir. 2016); <u>McDaniel v. Colvin</u>, 2017 WL 1399629, *5 (C.D. Cal. Apr. 18, 2017)("[T]here can be no conflict between the vocational expert's testimony and the DOT where, as here, the DOT is silent on the subject in question."; citation omitted).

Therefore, the ALJ did not err in relying on the VE's testimony that Plaintiff was able to perform her past small products assembly job as actually and generally performed.

//

//

---

[12]   The Court will address the merits of Plaintiff's assertion, even though, as Defendant contends, Plaintiff has waived this issue (<u>see</u> Joint Stip. at 20-21).

**ORDER**

For the foregoing reasons, the decision of the Commissioner is AFFIRMED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: August 14, 2019

                                    /s/
                          _____
                          ALKA SAGAR
                          UNITED STATES MAGISTRATE JUDGE